UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.,

USDC SDNY  ORIGINAL
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7·11·12

                    Plaintiff,              11 Civ. 2730 (LLS)

        - against -                         OPINION AND ORDER

JOHN M. O'QUINN & ASSOCIATES, L.L.P.
d/b/a THE O'QUINN LAW FIRM,

                    Defendant.
- - - - - - - - - - - - - - - - - -X

        Plaintiff Robinson Brog Leinwand Greene Geneovese & Gluck
P.C. ("Robinson Brog," a New York-based law firm), defendant
John M. O'Quinn & Associates, L.L.P. d/b/a The O'Quinn Law Firm
(the "O'Quinn Firm," a Texas-based law firm), and a third law
firm agreed in 2007 jointly to represent putative plaintiffs in
a stock-price manipulation litigation (the "Escala Litigation").
As part of that agreement, the defendant O'Quinn Firm promised
to finance the litigation.

        In 2009, however, following the death of its founding
partner, the O'Quinn Firm withdrew from its representation of
the clients in the Escala Litigation, refused to provide
additional financing, and did not reimburse Robinson Brog for
expenses Robinson Brog had incurred.

        Robinson Brog sues the O'Quinn Firm for breach of contract,
promissory estoppel, quantum meruit, unjust enrichment, breach
of implied contract, negligent misrepresentation, and equitable

estoppel.

The O'Quinn Firm moves to dismiss or stay this action, contending that the arbitration provision in the retainer agreement signed by the plaintiffs and some of the attorneys in the Escala Litigation covers Robinson Brog's claims in this action, and thus those claims must be submitted to arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. Although Robinson Brog did not sign that agreement, the O'Quinn Firm argues that Robinson Brog has directly benefited from it, and thus is estopped from avoiding its arbitration clause.

The O'Quinn Firm further moves to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(2), asserting that it is not subject to personal jurisdiction in New York, and under Fed. R. Civ. P. 12(b)(6), arguing that the amended complaint fails to state a claim on which relief can be granted. The O'Quinn Firm requests that if the complaint is not dismissed and the proceedings are not stayed, that this case be transferred to the United States District Court for the Southern District of Texas, under 28 U.S.C. § 1404(a).

### Background

#### The Joint Representation and Contracts

Taking the factual allegations of the amended complaint as true:

In June 2007, John O'Quinn, the O'Quinn Firm's founding

partner, met with partners from Robinson Brog, a partner from the law firm Christian Smith & Jewell LLP ("CS&J"), and putative Escala Litigation plaintiff Greg Manning at Robinson Brog's offices in New York.   "During the meeting, the participants discussed the facts of the Escala Litigation, which involved a fraudulent scheme to manipulate Escala's stock, which was publicly traded on the NASDAQ."   Am. Compl. ¶ 15.   At that meeting, John O'Quinn "negotiated and reached an agreement with Robinson Brog and CS&J on the terms and conditions of Robinson Brog becoming co-counsel with O'Quinn and CS&J in prosecuting the Escala Litigation, to which Mr. Manning consented."   Id. ¶ 18.

In August and September 2007, the O'Quinn Firm, CS&J, and their Escala Litigation clients entered into the Power of Attorney and Contingent Fee Contract (the "Client Agreement"), which governs the O'Quinn Firm and CS&J's joint representation of those clients, and provides that those firms are entitled to "50% of any net settlement or recovery (including the value of any non-monetary recovery) made before or after the Litigation is commenced."   Client Agreement § 2.01, Bennett Decl. in Supp. of the O'Quinn Firm's 12(b)(1) Mot. ("Bennet Decl. I") Ex. 2. Section 9.01 of the Client Agreement permits the O'Quinn Firm and CS&J to withdraw from representation of the clients in certain circumstances.

The Client Agreement originally provided that its parties were required to arbitrate certain disputes arising under the agreement. That section was later amended, and now provides in relevant part:

> Any and all disputes, controversies, claims or demands arising out of or relating to (1) this Agreement or (2) any provisions hereof or (3) the providing of services by ATTORNEYS [i.e., the O'Quinn Firm and CS&J] to THE CLIENT or (4) the relationship between ATTORNEYS and THE CLIENT, whether in contract, tort or otherwise, at law or in equity, for damages or any other relief, shall be resolved by binding arbitration pursuant to the Federal Arbitration Act in accordance with the Commercial Arbitration Rules then in effect with the American Arbitration Association. . . . Any such arbitration proceeding shall be conducted in Harris County, Texas. . . . This arbitration provision shall be enforceable in either federal or state court in Harris County, Texas pursuant to the substantive federal laws established by the Federal Arbitration Act. Any party to any award rendered in such arbitration proceeding may seek a judgment upon the award and that judgment may be entered by any federal or state court in Harris County, Texas having jurisdiction.

Amendment to Client Agreement § 11.01, Bennett Decl. I Ex. 3.

Robinson Brog, which had not yet formally agreed to undertake the joint representation of the putative plaintiffs in the Escala Litigation, is not a party to and is not mentioned in the Client Agreement. However, section 8.01 of the Client Agreement states, "Attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid clients."

Several months after the Client Agreement was signed, in

October 2007, Robinson Brog formally agreed to join in the representation of the Escala Litigation plaintiffs, by signing the Joint Responsibility Referral Fee Letter Agreement (the "Joint Responsibility Agreement"), which states:

> This letter will confirm that you will agree to undertake joint representation of the Escala Group shareholder Clients with the Limited Liability partnership of JOHN M. O'QUINN & ASSOCIATES ("O'QUINN") AND CHRISTIAN SMITH & JEWELL, LLP ("CHRISTIAN"), (collectively "Handling Attorneys").
>
> Pursuant to Texas Disciplinary Rule of Professional Conduct 1.04, you agree to assume joint responsibility for the prosecution of Client's cause of action in Georgia with Handling Attorneys.
>
> At the conclusion of the Georgia case, subject to you complying with all rules including but not limited to rule 1.04, if a recovery is made on behalf of Clients, of the total attorneys' fees of 50% out of 100% of any net settlement or recovery, that 50% attorneys' fees (net recovery) will be divided as follows (after payment of all expenses in the Georgia case): 61.86% of the net recovery attorney fees will be paid to O'QUINN, 13.14% of the net recovery attorney fees will be paid to CHRISTIAN, and 25% of the net recovery attorney fees will be paid to you. In the Georgia case, all reasonable and customary expenses shall be paid 100% by O'QUINN.
>
> A net settlement or recovery is the amount remaining of the settlement or recovery after reimbursing O'QUINN for any charges or expenses of litigation incurred by or due to being reimbursed to O'QUINN.
>
> The Clients will be informed of our respective roles regarding this matter, and will execute and sign a separate Consent to Refer Agreement indicating their approval of an acceptance of same.
>
> If this Joint Responsibility Referral Letter Agreement is satisfactory, you should sign above your

name and date below and return the original to this office.

Bennett Decl. I Ex. 1 (emphasis in original).

A representative of CS&J also signed the Joint Responsibility Agreement. The O'Quinn Firm contends that it never signed the agreement.

Because the Texas Disciplinary Rules forbid attorneys from entering into fee-sharing arrangements without express consent of their clients, Robinson Brog, the O'Quinn Firm, and CS&J signed, and required their Escala Litigation clients to sign, the Consent to Refer Agreement, which stated that Robinson Brog had referred the clients to the O'Quinn Firm and CS&J, that all three firms would be jointly prosecuting the case, and that attorneys' fees would be divided among the firms, specifying the percentage each firm would receive. See Consent to Refer Agreement, Bennett Reply Decl. Ex. 2.

Thus, the three contracts operate as follows: the Client Agreement establishes the attorney-client relationship, sets the 50% contingency fee rate, and includes the clients' promise to pay their attorneys' fees. See Client Agreement § 3.01 ("In consideration of Attorneys' services, the client hereby conveys and assigns to Attorneys and agrees to pay to Attorneys and undivided interest in and to all of Client's claims and causes of action to the extent of the percentage set out in Paragraph

6

2.01.").    It    has    an    arbitration    clause.    The    Joint Responsibility  Agreement  provides  that  Robinson  Brog  will prosecute  the  Escala  Litigation  jointly  with  the  O'Quinn  Firm and CS&J, and specifies the respective percentage shares of each firm in the event of a net recovery or settlement.  The Consent to Refer Agreement informs the clients that Robinson Brog, which had not yet formally agreed to the joint representation when the Client  Agreement  was  signed,  would,  upon  the  clients'  consent, join  in  the  prosecution  of  the  Escala  Litigation,  and  reflects the clients' consent to the stated portions of the net fee each law firm would receive.

### Robinson Brog's Involvement in the Escala Litigation

According to the amended complaint,

> .  .  .  Robinson  Brog  performed  extensive  legal  work
> researching  applicable  laws,  investigating  the  facts,
> reviewing  thousands  of  pages  of  materials  supplied  by
> Manning on Escala and the stamp business in general,
> interviewing witnesses in the United States and Spain,
> consulting    with    liability    and    damage    experts,
> including  Bruce  Cook,  John  Finnerty,  Robert  Blakely
> and Robert Shapiro, drafting and editing documents and
> pleadings  and  conducting  extensive  conferences  with
> CS&J and Manning.

Am. Compl. ¶ 26.

Robinson  Brog  alleges  that  it  "performed  these  and  other tasks (and incurred significant expenses) in reasonable reliance on    its    agreement    with    O'Quinn    and    O'Quinn's    express representations  that  it  would  finance  the  Escala  Litigation."

Id.

## The O'Quinn Firm's Withdrawal

In October 2009, John O'Quinn died in an automobile accident. One year later, an attorney for the O'Quinn Firm notified its Escala Litigation clients that it was withdrawing as counsel, stating:

> After investigation, research, and analysis, the O'Quinn Law Firm no longer believes pursuit of your potential claims is economically feasible or advisable. Neither common law principles, the Power of Attorney and Contingency Fee Agreement [POA], nor the disciplinary rules require the Firm to pursue a case that it deems without significant merit and/or against its economic interest. Further, in the opinion of the O'Quinn Firm, based on its analysis of the potential claims, it would be impractical for the O'Quinn Firm to proceed with any further handling of your potential claims. Accordingly, based upon the O'Quinn Firm's assessment of your claims and potential causes of action, the Firm has determined that it must withdraw from any further representation.

> Pursuant to paragraphs 5.01 and 9.01 of the POA, as quoted above, the Firm hereby gives to you thirty days notice of its withdrawal from representation of you. You should obtain new lawyers to represent you forthwith, if you wish to pursue these potential claims. In connection with its withdrawal, the O'Quinn Firm releases its contingency fee interest in its entirety and any claim it could make to additional expenses incurred in the investigation of your potential claims.

Steed Aff. ¶ 10, Decl. of Norma Bennett in Supp. Def.'s 12(b)(2) Mot. Ex. 1 (brackets in original).

Robinson Brog alleges, "While John O'Quinn's death was tragic, the obligation to prosecute and finance the Escala

Litigation, including payment of expenses, is an obligation of the Defendant to Robinson Brog that did not terminate upon John O'Quinn's Death."  Am. Compl. ¶ 31.

Robinson Brog thus sues the O'Quinn firm for breach of the Joint Responsibility Agreement, alleging "expectancy damages" of $12,515,000, which it would have purportedly recovered in the Escala Litigation had the O'Quinn Firm not withdrawn from its representation of its clients.  The amended complaint further alleges that because the O'Quinn Firm contracted to pay "all reasonable and customary expenses" incurred in the Escala Litigation, it must reimburse Robinson Brog $400,000 for expenses and legal services.

## Discussion

### The O'Quinn Firm's Motion to Submit the Action to Arbitration

The O'Quinn Firm argues that this Court should stay or dismiss this action because the arbitration clause in the amendment to the Client Agreement requires that Robinson Brog submit its claims to arbitration in Harris County, Texas. Although Robinson Brog did not sign the Client Agreement or its amendment, the O'Quinn Firm contends that Robinson Brog directly benefited from the Client Agreement and therefore is estopped from avoiding its arbitration clause.

### A.  Choice of Law

Section 2 of the FAA "makes written arbitration agreements

9

'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.'" Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 629-30 (2009), quoting FAA, 9 U.S.C. § 2.   "Section 3, in turn, allows litigants already in federal court to invoke agreements made enforceable by § 2.   That provision requires the court, 'on application of one of the parties,' to stay the action if it involves an 'issue referable to arbitration under an agreement in writing.'"   Carlisle, 556 U.S. at 630 (footnote omitted), quoting FAA, 9 U.S.C. § 3.   Because "neither provision purports to alter the background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)," state law "is applicable to determine which contracts are binding under § 2 and enforceable under § 3 'if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'" Carlisle, 556 U.S. at 630-31 (emphasis omitted), quoting Perry v. Thomas, 482 U.S. 483, 493 n.9 (1987).

Since the issue raised by the O'Quinn Firm's estoppel argument is one of enforceability, state law governs.   And because the Client Agreement, which contains the arbitration clause, "shall be construed under and in accordance with the laws of the State of Texas," Client Agreement § 10.01, Texas law applies in determining whether the Client Agreement's

10

arbitration clause is enforceable against Robinson Brog.

## C. Direct Benefits Estoppel

Robinson Brog contends that it is not bound by the arbitration clause in the Client Agreement, because it is not a signatory to that contract.

### 1.

"Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate." In re Kellog, Brown & Root, Inc., 166 S.W.3d 732, 738 (Tex. 2005). "Because arbitration is contractual in nature, the FAA generally 'does not require parties to arbitrate when they have not agreed to do so.'" Id., quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478-79 (1989).

> Federal and Texas state courts have recognized, however, that "[i]t does not follow . . . that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the arbitration provision"; instead, under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement.

Kellogg, 166 S.W.3d at 738 (omission and brackets in Kellogg), quoting Fisser v. Int'l Bank, 282 F.2d 231, 233 (2d Cir. 1960).

One such circumstance is in the case of "direct benefits estoppel." "Under 'direct benefits estoppel,' a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes." Kellogg, 166 S.W.3d

11

at 739.  "Thus, a non-signatory plaintiff may be compelled to arbitrate if it seeks to enforce terms of a contract containing an arbitration provision."  Id.

**2.**

By bringing this suit, Robinson Brog seeks to enforce the terms of the Client Agreement and therefore is estopped from avoiding its arbitration clause.

Robinson Brog alleges in its amended complaint that "While John O'Quinn's death was tragic, the obligation to prosecute and finance the Escala Litigation, including payment of expenses, is an obligation of the Defendant to Robinson Brog that did not terminate upon John O'Quinn's death."  Am. Compl. ¶ 31. However, it is the Client Agreement that creates the attorney-client relationship, allows for the employment of additional attorneys, thus permitting Robinson Brog's entry into the case, see Client Agreement § 8.01 ("Attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client."), and sets the terms on which the attorneys may withdraw, see id. § 9.01 ("Attorneys accept employment on the condition that if, after investigation, research, and analysis, it ever appears to attorneys that . . . (b) the pursuit of Client's Claim is no longer economically advisable or feasible . . . the Attorneys may withdraw.").

Thus, when the O'Quinn Firm announced its withdrawal from

representation of its Escala Litigation clients, it referred to
the Client Agreement by its formal name ("Power of Attorney and
Contingency Fee Agreement") and quoted it in the withdrawal
letter: "After investigation, research, and analysis, the
O'Quinn Law Firm no longer believes pursuit of your potential
claims is economically feasible or advisable. Neither common
law principles, the Power of Attorney and Contingency fee
Agreement [POA], nor the disciplinary rules require the firm to
pursue a case that it deems without significant merit and/or its
economic interest." Steed Aff. ¶ 10 (brackets in original).

Whether "a claim seeks a direct benefit from a contract
containing an arbitration clause turns on the substance of the
claim, not artful pleading." In re Weekley Homes, L.P., 180
S.W.3d 127, 131-32 (Tex. 2005).

Robinson Brog's position is that it signed no agreement
with an arbitration clause, contracted only with the O'Quinn
Firm and CS&J, and the obligations it seeks to enforce are those
of the O'Quinn Firm under its contract with Robinson Brog and
CS&J.

But Robinson Brog did not represent the O'Quinn Firm in the
contemplated litigation: it represented the Escala Litigation
clients. Robinson Brog's authority to represent those clients
came from the Client Agreement, which provided for the admission
of Robinson Brog into the attorney-client relationship it

13

established (the O'Quinn Firm could "use or associate other attorneys in the representation of the aforesaid claims of the client," see Client Agreement § 8.01)[1]; set the bounds of the attorneys' fees payable upon a favorable outcome, and thus defined the pool of funds in which Robinson Brog would share; and required the arbitration of disputes in Texas. Claiming its share (as more elaborately specified in the Joint Responsibility Agreement) of fees from that pool, Robinson Brog cannot evade the arbitral process required by the Client Agreement which is its source.

Since Robinson Brog seeks to enforce the Client Agreement, it is estopped from avoiding its arbitration clause and must submit to arbitration all claims that are within the scope of that clause.

### D. Scope of the Arbitration Clause

The next question is whether Robinson Brog's claims fall within the scope of that clause, keeping in mind the "'liberal federal policy favoring arbitration agreements.'" See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987), quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

"If the allegations underlying the claims 'touch matters' covered by the" Client Agreement, "then those claims must be

---

[1] Each client was informed of Robinson Brog's participation and of the details of the fee-splitting percentages, and each client consented.

arbitrated, whatever the legal labels attached to them." Genesco, 815 F.2d at 846, quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 473 U.S. 614, 624 n.13 (1985).

"Determining whether a dispute falls within the scope of an arbitration clause requires the court to characterize the arbitration clause as 'broad' or 'narrow.'" Jureczki v. Banc One Tex., N.A., 252 F. Supp. 2d 368, 374 (S.D. Tex.), aff'd, 75 F. App'x 272 (5th Cir. 2003); accord Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (a "court should decide at the outset whether 'the arbitration agreement [is] broad or narrow.'  If broad, then there is a presumption that the claims are arbitrable.") (brackets in Collins & Aikman), quoting Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 63 (2d Cir. 1983).

The Client Agreement's arbitration clause covers "claims or demands arising out of or relating to (1) this Agreement or (2) any provisions hereof or (3) the providing of services by ATTORNEYS TO THE CLIENT or (4) the relationship between ATTORNEYS and THE CLIENT."  Its specification of "claims or demands arising out of or relating to (1) this Agreement" is "the paradigm of a broad clause." Collins & Aikman, 58 F.3d at 20 (brackets omitted); accord RSR Corp. v. Siegmund, 309 S.W.3d 686, 701 (Tex. App. 2010) (clauses requiring arbitration of "any action or proceeding arising out of or relating to this

15

Agreement" "are broad and encompass all claims that have some possible relationship with the agreement, including those claims that may only 'relate to' the agreement").

## 1.

Robinson Brog's claims for breach of contract, promissory estoppel, and equitable estoppel are all based in part on the O'Quinn Firm's failure to prosecute the Escala Litigation, and accordingly they require an interpretation of section 9.01 of the Client Agreement to determine whether the O'Quinn Firm's withdrawal was permissible.   Therefore, those claims arise out of or relate to the Client Agreement and fall within the scope of its arbitration clause.

## 2.

Robinson Brog's remaining claims – quantum meruit, unjust enrichment, breach of implied contract, and negligent misrepresentation – are not based on the O'Quinn Firm's failure to prosecute the Escala Litigation, but instead are based on the O'Quinn Firm's promise to fund all litigation expenses.   See Joint Responsibility Agreement ("In the Georgia case, all reasonable and customary expenses shall be paid 100% by O'Quinn.").   That promise is found only in the Joint Responsibility Agreement.   Its functional connection to the clients and the Client Agreement, however, is shown by the fact that (as required by Texas law) it was circulated to each client

16

and obtained their individual consents.

Furthermore, section 6.01 of the Client Agreement provides, "Attorneys agree to be responsible for and to pay all expenses of Litigation, including without limitation, court costs, deposition expenses, expert witness fees, travel, and any other expense related to litigation."  It is thus necessary to refer to the Client Agreement to determine which expenses are "reasonable and customary" under the Joint Responsibility Agreement.  See Fort Worth Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000) ("instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other") (footnote omitted); Jones v. Kelley, 614 S.W.2d 95, 98 (Tex. 1981) ("instruments may be construed together or treated as one contract even though they are not between the same parties").

The dispute over the terms and consequences of the O'Quinn Firm's withdrawal from the Client Agreement relates to that agreement and is arbitrable under its provision, even though its determination will also require application of, and recourse to, the Joint Responsibility Agreement.

### E. Dismissal

Section 3 of the FAA, 9 U.S.C. § 3, provides that

17

> . . . the court in which suit is pending, upon being
> satisfied that the issue involved in such suit or
> proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties
> stay the trial of the action until such arbitration
> has been had within the terms of the agreement.

Where, as here, "all of the issues raised in a litigation lie within the scope of an arbitration agreement, courts have discretion to dismiss the action rather than issue an order directing a stay." Sea Spray Holdings, Ltd. v. Pali Fin. Grp., 269 F. Supp. 2d 356, 366 (S.D.N.Y. 2003). It is common for courts to retain jurisdiction to await confirmation of a prospective arbitral award. That does not apply here, since the arbitration provision in the Client Agreement provides for entry of judgment upon the award by "any federal or state court in Harris, County Texas having jurisdiction." Amendment to Client Agreement § 11.01. "As no useful purpose exists for directing a stay of this litigation where all of the issues in dispute are subject to arbitration, the Court will dismiss the action rather than issue a stay." Sea Spray, 269 F. Supp. 2d at 366-67. The amended complaint is therefore dismissed.

### Conclusion

The O'Quinn Firm's motion to dismiss or stay the action pending arbitration pursuant to section 11.01 of the Client Agreement (Dkt. No. 30) is granted insofar as the amended complaint is dismissed. The O'Quinn Firm's motions to dismiss

18

for lack of personal jurisdiction (Dkt. No. 27) and for failure
to state a claim (Dkt. No. 33) are denied as moot.

So ordered.

Dated:  New York, New York
        July 10, 2012

Louis L. Stanton
Louis L. Stanton
U.S.D.J.

19